# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**SUSANNE D. JOHNSON,**

     **Plaintiff,**

**v.**                                    **Case No. 5:12cv222/MP/CJK**

**CAROLYN W. COLVIN,**
**Commissioner of Social Security,**[1]

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's applications for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34.

     Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), she therefore is automatically substituted for Michael J. Astrue as the Defendant in this case.

decision of the Commissioner, therefore, should be affirmed and the application for disability insurance benefits denied.

## PROCEDURAL HISTORY

Plaintiff/Claimant, Susanne Denise Johnson, filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning March 20, 2004. The claim was denied initially and upon reconsideration. Claimant appeared for a hearing before the administrative law judge ("ALJ") on July 21, 2010. On November 5, 2010, the ALJ found that Ms. Johnson was not disabled as defined by the Act. T.17.[2] Ms. Johnson requested review by the Appeals Council, which denied the request on April 11, 2012. T. 1-7. The Appeals Council's action became the final decision of the defendant Commissioner, and Ms. Johnson instituted this action, challenging the decision. Plaintiff maintains that the ALJ's decision is not supported by substantial evidence of record and that the ALJ erred in (1) failing to properly assess Plaintiff's mental impairments and denying Plaintiff's request for IQ testing and further assessment and in (2) finding Plaintiff not credible. This Report and Recommendation will proceed with those issues in mind.

## FINDINGS OF THE ALJ

In his written decision, T. 11-17, the ALJ made a number of findings relative to the issues raised in this appeal:

---

[2] The administrative record, as filed by the Commissioner, consists of seven volumes (docs. 10-2 through 10-8) and has 350 consecutively numbered pages. References to the record will be by "T.", for transcript, followed by the page number.

Case No. 5:12cv222/MP/CJK

1.  Claimant met the insured status requirements of the Social Security Act through December 31, 2008.

2.  Claimant has not engaged in substantial gainful activity since March 20, 2004, the alleged onset date.

3.  Claimant has the following severe impairments: mild degenerative changes in the facet joints of the lumbar spine, scoliosis of the lumbar spine, and mild disc bulges of the cervical spine.

4.  Claimant's impairments do not meet the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Through the date last insured, claimant had the residual functional capacity to perform a full range of medium work as defined in 20 C.F.R., section 404.1567(c).

6.  Through the last date insured, claimant was capable of performing her past relevant work as a hotel maid.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said that

"'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at1439). Thus, although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *See Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[3]

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

---

[3] The Eleventh Circuit not only speaks of independent review of the administrative record, but it also reminds us that it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir.

1986). The Eleventh Circuit has explained the operation of step five. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ("'The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act.'")).

Step five (or step four in cases such as the present one, where the ALJ decides a claimant can perform her past work) is often where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[4] "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's]

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20 C.F.R. § 404.1520(a)(4).

Case No. 5:12cv222/MP/CJK

limitations."[5]  20 CFR § 404.1545(1).  Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

## FACT BACKGROUND AND MEDICAL HISTORY[6]

In the course of her application for benefits, claimant provided information to complete the Disability Report–Adult–Form SSA-3368.  She speaks and understands English.  T. 180.  She can read and can write more than her name.  T. 180.  She claimed her ability to work is limited by cervical spondylosis and herniated lumbar disc, causing pain and weakness.  T. 181.  She traced her inability to work to a car

---

[5] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence.  In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).)  We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations.  (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[6] The recitation of medical and historical facts of this case, as set out below, is based upon my independent review of the record.  Although intended to be thorough and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

Case No. 5:12cv222/MP/CJK

accident in March 2004. T. 181. In the disability report, claimant described generally her work as a housekeeper. She needed no technical knowledge or skills. T. 182. The work primarily involved walking and standing. She would be required to carry cleaning supplies and linens and take out the trash. T. 182. She had no responsibility to supervise other workers, nor was she a lead worker. T. 182-183.

Plaintiff dates her physical problems from an automobile accident on March 20, 2004. T. 270. The accident also coincides with when Ms. Johnson stopped working. T. 33-37. In March of 2005, Dr. Richard Fellrath found claimant's symptoms had improved, then worsened. Dr. Fellrath recommended a tapered oral steroid treatment. T. 259. A physical exam shortly thereafter found full range of cervical motion, no tenderness with paraspinal palpation, no pain with resisted internal or external rotation and no pain with posterior push-off. T. 258. Muscle strength testing in each arm was 5/5. At the same exam, April 29, 2005, Dr. Cory Gaiser found normal gait and muscle strength at 5/5 for the legs. T. 261. An MRI, apparently reviewed on that date, showed minimal herniated disc at C5-6. T. 261, 262.

Dr. Keith Banton is claimant's primary care physician. Under Dr. Banton's care in 2006 and 2007, claimant was prescribed Lortab, Ultram, Cymbalta and Flexeril. T. 263. She had cervical radiculopathy with neck pain and sciatica with low back pain, both seemingly tracing to the accident. T. 274. Physical examinations conducted by Dr. Banton revealed normal neurological findings, with neck pain and point tenderness in the low back. T. 270, 273. As of November 2005, Dr. Banton reported plaintiff was doing well and that her neck and back pain had improved. T. 271.

Dr. Banton completed a brief questionnaire concerning physical function. T. 286. He found no motor deficits in any extremities and, accordingly, no sustained disturbance of "gait, station, and/or fine or gross movement." He reported 5/5 grip strength, as well as 5/5 "specific remaining strength" for any affected extremity or muscle group. Plaintiff had normal gait and station. Plaintiff would not allow an assessment of her ability to squat, walk on her toes, or walk on her heels, saying she knew that such maneuvers would cause too much pain. T. 286.

State agency physician, Dr. Edward Miranda, reviewed the medical chart in September 2008. T. 332-336. Dr. Miranda found claimant capable or performing work at the medium level of exertion. The medical record did not, according to Dr. Miranda, support claimant's subjective complaints. Dr. Miranda noted the disc herniation at C5-6, specifically noting that the radiology report had no mention of "foraminal stenosis and only mild thecal impingement." T. 336.

Given her complaints of back and leg pain, Ms. Johnson had a lumbar spine MRI on May 3, 2010. The study found degenerative changes of the lumbar spine, without "significant spinal canal or neural foramina narrowing. T. 343. The facility also conducted a CT scan of claimant's cervical spine. This study showed spondylosis and slight disc protrusions at C5-6 and C6-7 without "encroachment concerns of the cord or roots." T. 344.

As indicated by the synopsis of the ALJ hearing below, plaintiff also suggests she had an intellectual impairment. This argument focuses primarily upon two pages of plaintiff's school records, legible copies of which appear at Doc. 14-1. These pages, which must be part of a larger school chart, date from the 1960s and 70s. Claimant's grades were poor. A test program summary shows that she placed in the

lower half of test takers for scholastic ability and achievement.   In her arguments before this court, plaintiff focuses heavily upon reports of two IQ test scores, apparently from 1971 and 1972.  These tests, reported as "Henson Nelson", show scores of 65 and 78.  Claimant took these tests when she was aged nine to eleven.

<u>HEARING BEFORE THE ALJ</u>

Upon commencement of the hearing, the ALJ inquired whether counsel for plaintiff was aware of anything for which the record should be kept open after the hearing.  Counsel responded he might have "a couple of records from Dr. Banton's [phonetic] office, but I will get that to you by tomorrow. . . T. 25-26.  The ALJ then mentioned a pending request for a psychological consult.[7]  T. 26.  At the end of the hearing, the ALJ said he would keep the record open for the doctors' records and would deny the request for a psychological consult.  T. 54.

Claimant testified on her own behalf at the hearing.  She was 48 years old.  T. 29.   She had dropped out of school in the seventh grade and attended vocational school for training as a legal secretary, but did not complete the course.  T. 31.   She believes she was in regular classes while in school.  T. 35.  Depending on the level of reading, she would have difficulty "understanding most of the words. . ."  T. 35.  Ms. Johnson can read a newspaper to determine, for instance, what stores are having sales.  T. 32.  She is able to write a note to her husband and can figure out the change she will get back at the store upon making a purchase.  T. 32.

---

[7]Before the hearing, counsel had written the ALJ requesting "IQ testing and memory testing. . ."  Counsel suggested claimant might meet Listing 12.05C or that her memory is a significant impairment.  T. 244.  After the hearing, counsel renewed the request for IQ and memory testing.  T. 248.

Case No. 5:12cv222/MP/CJK

In terms of employment, claimant worked as a hotel housekeeper from the mid-80s through March of 2004.  T. 33.  She has not done other work over the past fifteen years.  T. 33.

Claimant had an automobile accident in 2004 and has had neck and low back problems since.  T. 36-37.  She says the pain at times can become "intolerable."  T. 37.  Her pain goes down the left arm, and sometimes affects both sides of the neck.  T. 38-39.  She said she is not able to wash and fix her hair; immediately after that, however, she said she had done her hair in preparation for the hearing.  T. 39.  If she were to lift a gallon of milk, she would feel a pull on the left side.  T. 40.  Once, when washing dishes, she felt a "tingling" and almost dropped what she had in her hand.  T. 41.

As to the low back, the pain goes down her legs to her feet.  T. 41-42.  Her doctors have recommended surgery on the lower back.  T. 42.  The pain is such that she has to get up from sitting or put a pillow behind her back if she is going to sit up.  T. 43.  She needs to change her position every five to ten minutes.  T. 44.  Her ability to stand for any period of time depends on the level of pain.  T. 45.  Claimant's husband and daughter help around the house.  She denied ability to do much of any household chores.  T. 46.  Her days are spent around the house.  Nevertheless, she can drive a car "to get where I need to go."  T. 49.

Ms. Johnson denied any memory problems, then said "I forget some things," then said "I don't know."  T. 48.  Concentration is hard for her when she is on her pain medication.  T. 49.  She is able to get along with friends and family members.  T. 50.

Vocational expert Paul Dolan also testified. Having reviewed the records and heard plaintiff's testimony, Mr. Dolan was of the opinion plaintiff could work as a maid. This job is classified as light by the Dictionary of Occupational Titles and also as unskilled. T. 53-54. Plaintiff's counsel had no cross-examination for the vocational expert.

Counsel made closing remarks focusing upon the issue of claimant's educational level and IQ. T. 55. According to counsel, the question of intellectual impairments might give the case–which had been heard two years before by another ALJ–"a whole new cast." T. 55. Counsel said he had requested the psychological testing based upon memory difficulties and "schooling issues." T. 54-55. He also believed an IQ test would be "suggested by other evidence of record." T. 56.

## ANALYSIS

In her first point, plaintiff urges error in the ALJ's failure to "properly evaluate evidence of additional mental impairment and develop the record." Doc. 14, p. 9. She reminds the court that plaintiff's lawyer requested further IQ testing and that the ALJ twice denied the request. She notes with emphasis that the ALJ did not address at all claimant's "school records" or her "very low IQ." In her reply, plaintiff argues that because the ALJ made no note at all of these matters, the court should not be mislead by the Commissioner's "post hoc" arguments made before this court. Doc. 16, p. 2-3.

Although certainly not unaware of her undisputed work history, plaintiff entirely glosses over her career as a hotel housekeeper. Also, plaintiff makes little note of her testimony at the hearing (except with regard to complaints of pain), which the undersigned finds significant in two regards.

Case No. 5:12cv222/MP/CJK

First, plaintiff had no difficulty at all in understanding and responding to questioning at the hearing. Simply put, she displayed a commendable ability to relate events, to describe her activities, and to use grammar and language content that would certainly pass as acceptable, even from a skeptical listener. The method of responding was not at all consistent with someone laboring under a disabling intellectual disability.

Of equal import is the content of plaintiff's responses. As the second point in this case argues for plaintiff's veracity, the undersigned has no reason to doubt that plaintiff's testimony at the hearing concerning her life experiences was true. In her testimony, plaintiff indicated she could read a newspaper to determine which stores were having sales. She could write a note to her husband. She could figure out change on a purchase at the grocery store. While a public school student, she attended regular classes. She has never claimed that she had any intellectual impediment to her long-time employment as a hotel housekeeper.

Also not emphasized by the plaintiff is the thorough psychological examination she had by Dr. Kline, a psychologist, at the Commissioner's request. Her reference to Dr. Kline's findings merely notes that the doctor specified that he was not determining whether plaintiff had an intellectual disability. Doc. 14, p. 11. Nevertheless, the notes of the consult are enlightening. Noting that claimant left school before finishing seventh grade, Dr. Kline recorded that claimant had nonetheless obtained her GED. T. 288. Claimant married at age 26 and has been married to her husband for 19 years. She maintains "a close and supportive relationship with all of her children." T. 287. She reported she left school due to "family issues." T. 288. She presented to the interview with appropriate grooming

and hygiene. She was "nicely dressed" and maintained appropriate eye contact with the examiner. T. 288. She is able to use a microwave to prepare food. T. 287.

Dr. Kline's report would suggest that claimant's level of understanding and communication at the examination was similar to that exhibited at the hearing, as described above. "When she spoke her speech was normal in rate and tone, well-articulated, and easily understood. . . She appeared to understand commands, comments, and questions without difficulty." T. 288-289. Her thought expression was "generally rational and logical, but simple and concrete." T. 289. "Her speech was impoverished during the interview, but when she spoke there was no loosening of associations, rambling speech, or delusional thinking. . ." T. 289. "[H]er verbal structure was generally rational and logical." T. 289. Although she struggled with simple concentration tasks, "a formal mental status evaluation determined that she was fully oriented." T. 289. "She easily performed simple memory tasks." T. 289. Dr. Kline did not recommend any further testing of intellect and concluded claimant "could oversee the dispensation of any monetary benefits that might be awarded her without outside guidance." T. 289-290.

Upon this background, and focusing virtually entirely upon fragmentary, forty year old school records, claimant argues the ALJ failed to fulfill his duty to properly develop the record. The error flawed the analysis, she says, because her intellectual deficit met the requirements of step two of the sequential analysis, the point at which severe impairments are identified. Moreover, in plaintiff's opinion, the error should not be viewed as harmless because her serious intellectual impairment likely meets Listing 12.05C of 20 C.F.R. § 404, subpart P, Appendix 1 of the Social Security regulations. Under the Listings, a disability claimant with an impairment listed in or

equal to a listed impairment would be considered disabled without consideration of age, education or vocational background.  20 C.F.R § 404.1520(d).

The ALJ did not identify any intellectual or psychological impairment at step two of the sequential analysis.  At step two of the analysis, 20 C.F.R. § 404.1520(a)-(g), the ALJ must determine whether the claimant has a severe impairment that keeps her from performing her past work.  *See* 20 C.F.R. § 1520(c).  The burden at this step is on the claimant.  *See Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).  As to "severe impairment," the Commissioner's Regulations provide:

**What we mean by an impairment(s) that is not severe.**

(a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521. The Commissioner has adopted an interpretive ruling that specifically addresses how to determine whether medical impairments are severe. The ruling provides in part:

> As explained in 20 CFR, sections 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity]. An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856, at *3 (1985).

As applied, the step two severity determination is a threshold inquiry used to screen out "trivial" claims, meaning an impairment is not severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *See Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *see also Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987); *Stratton v. Bowen*, 827 F.2d 1447, 1453 (11th Cir. 1987); *McDaniel v. Bowen*, 800 F.2d 1026, 1031

(11th Cir. 1986). In other words, as construed by the Eleventh Circuit, "[a]n impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal." *McDaniel*, 800 F.2d at 1031. Emphasizing the threshold nature of the step two finding, the *McDaniel* court observed that the proper standard "allows only claims based upon the most trivial impairments to be rejected." *See id.* Accordingly, "severe impairment" is a "*de minimis* requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working." *Stratton*, 827 F.2d at 1452 n.9 (*quoting Baeder v. Heckler*, 768 F.2d 547, 551 (3d Cir. 1985)).

Despite the low bar guiding evaluation and identification of severe impairments, the ALJ did not err by declining to specify an intellectual impairment. All the evidence on the ground attested to claimant's ability to perform her past work from what we might call an intelligence perspective. She reported no difficulties in understanding her work, the tasks to be accomplished, or the means of carrying out her work objectives. She reported to Dr. Kline that she had obtained her GED. Nothing in Dr. Kline's consult would suggest significant intellectual impairment. Although claimant emphasizes that Dr. Kline "deferred" an Axis II diagnosis, the content of the doctor's report suggests he saw no need for such evaluation and confirms he never requested such. The claimant's own testimony affirms her ability to do past work, to take care of household matters, and to admirably maintain a long-term marriage with her husband and parenting relationship with her children. Thus, nothing before the ALJ suggests that an intellectual impairment, if indeed one exists,

would have had more than a minimal effect on claimant's ability to perform her past work as a hotel housekeeper. The ALJ committed no error in this regard.

The undersigned has also concluded that the ALJ did not err by failing to further develop the record by ordering IQ testing. The Social Security disability benefits process is inquisitorial rather than adversarial, *Sims v. Apfel*, 530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), *Crawford & Company v. Apfel*, 235 F.3d 1298 (11th Cir. 2000), and is informal. *Richardson v. Perales*, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 1426, 28 L.Ed.2d 842 (1971); *Kendrick v. Shalala*, 998 F.2d 455, 456 (7th Cir. 1993); 20 C.F.R. § 404.900(b). With informality comes a duty to develop a complete record as is done by European magistrates. *Kendrick*, 998 F.2d at 456. It is established in this Circuit that the ALJ has an affirmative duty to develop a full and fair record. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990); *Smith v. Bowen*, 792 F.2d 1547, 1551 (11th Cir. 1986); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). The duty to develop the record exists even though the plaintiff is represented by a lawyer or paralegal. *Brown*, 44 F.3d at 934 (*citing Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir. Unit B July 1981)); *Smith*, 792 F.2d at 1551 (*citing Cowart*, 662 F.2d at 735). This duty requires that the ALJ "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited," *Cowart*, 662 F.2d at 735 (citations omitted), and "investigate the facts and develop the arguments both for and against granting benefits." *Crawford & Company*, 235 F.3d at 1304.

That does not mean, however, that the ALJ must search to the last document to find every possible piece of relevant evidence. Rather, he must have sufficient evidence to decide the case. The seminal cases in this circuit on the ALJ's duty to develop the record are *Ford v. Secretary of Health and Human Servs.*, 659 F.2d 66 (5th Cir. Unit B Oct. 15, 1981), and *Reeves v. Heckler*, 734 F.2d 519 (11th Cir. 1984). Both held that it is not necessary for the ALJ to order a consultative examination unless the record establishes that such an examination was necessary to enable the ALJ to make a decision. Where the ALJ has sufficient information to decide the case, however, he can do so. *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (holding that where the record is complete and adequate to a decision, no showing of prejudice is made). Moreover, "[t]he claimant has the burden of proving he [or she] is disabled, and is therefore responsible for producing evidence in support of the claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. § 416.912(a), (c).

Here, the ALJ had an adequate record upon which to base a reliable finding. Apparently recognizing this, the Appeals Council affirmed in the face of an argument that further testing should have been obtained. As the Appeals Council noted, "the claimant was able to maintain steady work for the years prior to the accident. The claimant also mentions that she chose to leave school in order to pursue work, not because of her academic struggles or low IQ score. Finally, the claimant underwent a consultative examination, and the examining doctor fund no cognitive impairments present." T. 2. The Appeals Council not only considered the argument now advanced, but it also offered well-supported reasons for rejecting the argument.

As stated by the Commissioner's regulations, "[w]e may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim." 20 C.F.R. § 404.1519a(b).  The proper test is whether the record as a whole was sufficient to support an informed decision. *Reeves*, 734 F. 2d at 522, n. 1.  The record here meets the test.  Plaintiff had functioned without known difficulty, despite leaving school at an early age, for the ensuing forty years.  Only her physical complaints from an automobile accident led her to give up her job.  She was able to manage the functions of a household and has built and maintained a stable family life. Nothing in her presentation to a consulting psychologist suggested intellectual impairment of such a nature that the consultant felt a need to ask for further testing. The record, as reviewed by the ALJ, does not support a suggestion that another test would provide the key needed to understand the mystery of claimant's condition.  The condition was not mysterious.  The ALJ had solid, concrete facts upon which to conclude that plaintiff had functioned adequately, from an intellectual perspective, for her entire adult life.  The Commissioner had an adequate and complete record to support a decision in this case, and no error appears from failure to order further IQ testing.

Plaintiff next argues that the ALJ erred in the method by which he discounted plaintiff's credibility.  Plaintiff notes that the ALJ found her allegations "not fully credible in light of the evidence and for the reasons stated below."  T. 15.  This finding is then followed by a recitation of the pertinent medical evidence.  Granted, the recitation is brief, but so are the actual records of claimant's treatment for her

neck and low back conditions. Plaintiff's complaints, as expressed at the hearing, were of constant pain in her arms and legs, stemming from the 2004 accident.

Pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929. The Eleventh Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[8] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *Adamo v. Comm'r of Social Sec.,* 365 Fed. Appx. 209, 2010 WL 476691, *3+ (11th Cir. 2010) (quoting *Wilson*) (Table, text in WESTLAW); *Elam v. Railroad Retirement Bd*., 921 F.2d 1210, 1216 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529 because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson, supra*, 284 F.3d at 1226.

---

[8]*Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. The Eleventh Circuit has held that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1259 (M.D. Fla. 2005). However, the presence or absence of evidence to support symptoms of the severity claimed is a factor that can be considered. *Marbury*, 957 at 839-840; *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, if the Commissioner refuses to credit subjective testimony of the plaintiff concerning pain, he must do so explicitly and give reasons for that decision. *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). Where he fails to do so, the Eleventh Circuit has stated that it would hold as a matter of law that the testimony is accepted as true. *Holt*, 921 F.2d at 1223; *MacGregor*, 786 F.2d at 1054.[9]

---

[9]In *MacGregor*, the court said:

> If the Secretary refuses to credit such testimony he must do so explicitly and give reasons for that decision. *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir.1982). Where he fails to do so we hold as a matter of law that he has accepted that testimony as true.

786 F. 2d at 1054. Relying upon the earlier case of *Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir.1982), however, courts in the Eleventh Circuit are now generally opting for remand in cases of

Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The credibility determination does not need to cite particular phrases or formulations, but it cannot merely be a broad rejection which is not enough to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted). And of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. *Wilson*, 284 F.3d at 1225-26; *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F. Supp. 2d at 1259.

The need for a credibility determination is implicit in the Commissioner's evaluation of complaints of pain. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints"). People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be

inadequate credibility determinations (as well as cases involving rejection of treating physician opinion). *See, e.g., Lawton v. Comm'r*, 431 Fed. Appx. 830, 835, 2011 WL 2471475, *4 (11th Cir. June 22, 2011); *see also Albery v. Comm'r*, 2012 WL 2589297. *10 (M. D. Fla. June 7, 2012) ("The Eleventh Circuit has recently receded from [the *MacGregor*] language.").

Case No. 5:12cv222/MP/CJK

expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." *Hand, supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] allege[s] [is] credible when considered in the light of other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

The medical chart here, including the objective findings of diagnostic testing, supports the ALJ's credibility finding. Physicians' reports of examination findings also fit with the view ultimately adopted by the ALJ..

Fortunately, the record contains, and the ALJ noted, recent MRI and CT findings. Ms. Johnson had a lumbar spine MRI on May 3, 2010. The study found degenerative changes of the lumbar spine, without "significant spinal canal or neural foramina narrowing." T. 343. The same facility also conducted a CT scan of claimant's cervical spine. This study showed spondylosis and slight disc protrusions at C5-6 and C6-7, without "encroachment concerns of the cord or roots." T. 344. Thus, although the existence of objective findings cannot be doubted, the most recent evidence of those findings suggests that the type of defect sufficient to cause the pain claimant alleges does not exist. Even six years after her injury, the lumbar spine condition was not of the type that would cause problems with the nerves exiting the spinal column and running to the legs. The same must be said of the cervical

findings.  The studies showed no encroachment upon nerve roots, which would be the cause of arm pain.

Similarly, the physical observations recorded by physicians do not support the degree of pain alleged by claimant.  She exhibited normal muscle strength, absence of atrophy and normal gait.  During her treatment, the physicians observed good pain control through medication and even sought to wean claimant from her stronger pain medications.  T. 271.  Plaintiff objects to the ALJ's characterization of a June 2005 physical examination as "basically normal," but the chart from that date does not belie the comment.  T. 260.  Dr. Gaiser's physician's assistant certainly noted disc herniation at C5-6, but found the patient intact, stable and without positive findings upon examination.  T. 260.  Even plaintiff's personal physician, Dr. Banton, provided a strong functional support to the state agency.  Dr. Banton found normal strength and normal functioning as to all tests he was allowed to perform.

Notably in this case, claimant had the benefit of being followed post accident for over six years before the date of her hearing.  Yet, the records do not show someone who is becoming significantly worse, or who has developed a condition consistent with disabling pain.  A cervical herniation is an important finding, but contrary to plaintiff's implicit argument, it is not of such a nature as to produce automatically debilitating pain and disability.  Even six years after the injury, the radiology studies could not identify a source of significant radicular pain to claimant's extremities.  Plaintiff's claimed level of pain at the hearing is simply inconsistent with the medical observations.  The ALJ did not err in his evaluation of plaintiff's subjective complaints, nor of the credibility of such complaints.

It is therefore respectfully RECOMMENDED:

1.  The applications for disability insurance benefits be DENIED and the Commissioner's decision be AFFIRMED.

2.  That the clerk be directed to close the file.

At Pensacola, Florida, this 23rd day of December, 2013.


/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).


Case No. 5:12cv222/MP/CJK